[Cite as *State v. Sykes*, 2025-Ohio-5214.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

LEONARD L. SYKES,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 MA 0039

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2022 CR 00547

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lynn Maro*, Mahoning County Prosecutor, *Atty. Ralph M. Rivera* and *Atty. Kristie M. Weibling*, Assistant Prosecutors, for Plaintiff-Appellee

*Atty. Edward A. Czopur*, for Defendant-Appellant

Dated: November 7, 2025

**WAITE, J.**

{¶1} Appellant Leonard L. Sykes appeals a January 8, 2025 judgment entry of the Mahoning County Court of Common Pleas convicting him of various sexual abuse crimes against a minor. Appellant challenges the seizure of two of his cellphones and the warrant issued for their search. Appellant also contends that his convictions are against the manifest weight of the evidence because the victim recanted her allegations at trial. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Factual and Procedural History

{¶2} This matter began as an investigation seeking to locate a runaway twelve-year-old girl, M.P., but ended with an indictment charging Appellant with various sexual abuse offenses. In August of 2022, Julie Rudolph, assistant director of Mahoning County Children Services, spoke to Detective Tom Barone and Sergeant Robert Smith of the Mahoning County Sheriff's Office. Both officers were assigned to matters involving children's services. Rudolph informed the officers that M.P. had run away from home and might be in danger.

{¶3} In early September of 2022, investigators learned that M.P. had been active on social media. They tracked an IP address associated with her social media to an apartment on Park Avenue in Youngstown. On September 9, 2022, Det. Barone and Sgt. Smith formed a team of officers and went to the address to determine if M.P. was, in fact, at that location. A woman in her seventies named W.S. ("Mother") opened the door and confirmed to officers that M.P. had been staying at her residence and was presently there. She allowed the officers inside. They immediately saw M.P. exit a bathroom wearing only

a tank top and underwear. She appeared to be heading into a bedroom, where they later located Appellant. Appellant was living in his mother's apartment. At the time, Appellant was aged forty-nine.

{¶4} Appellant was uncooperative, and officers eventually handcuffed and detained him. Officers took his mother to the kitchen, and M.P. to a living room area. One officer went into the bedroom to retrieve clothing for M.P., who had instructed him where to find her clothing. While inside the bedroom, the officer noticed a bowl containing a white powder substance which had spilled over onto the screen of an iPhone located next to it. Next to the bowl was a scale. Officers believed the substance could be fentanyl, so they called in the drug task force to safely handle the powder. The cellphone was also seized, as it contained the substance on its screen.

{¶5} Sgt. Smith was somewhat familiar with M.P., as her family had long been involved with children's services, and he believed that they had a good rapport. During her conversation with the officers, M.P. informed them that she and Appellant were engaged in a sexual relationship. She explained that it began with Facebook messenger conversations that included the exchange of nude photographs and videos. She pointed to a nearby Samsung cellphone and told officers that Appellant used that phone to receive and send these photographs. Appellant's mother confirmed that Appellant used the Samsung phone on a daily basis, and that the phone found in the bedroom was an older phone no longer in use. Officers seized both phones. As officers had gone to the apartment intending only to look for a missing juvenile, and did not expect to engage in a possible drug or rape investigation, they did not have a warrant at the time.

{¶6}  Appellant was arrested and jailed.  M.P. was taken to a juvenile center. Following this, a search warrant was obtained to authorize a search of Appellant's phones.  Later testing of the white powder revealed that it was not an illegal drug.

{¶7}  On November 10, 2022, Appellant was indicted on the following charges: three counts of rape, felonies of the first degree in violation of R.C. 2907.02(A)(1)(b), (B); one count of importuning, a felony of the third in violation of R.C. 2907.07(A), (F)(2); and one count of disseminating matter harmful to juveniles, a felony of the fourth degree in violation of R.C. 2907.31(A)(1), (F).

{¶8}  On July 13, 2023, Appellant filed a motion to suppress any evidence obtained from a search of the two phones.  We note that nothing of evidentiary value was found on the iPhone located in the bedroom.  The Samsung phone, however, contained incriminating conversations and illicit photographs/videos between Appellant and M.P.  It appears that most, if not all, of the content was found by means of Facebook messenger, consistent with the information M.P. had provided to the officers.

{¶9}  The parties briefed the suppression issue.  The state argued that the plain view exception to the warrant requirement authorized seizure of both phones, and the later obtained search warrant permitted the search of those phones.  Prior to hearing on the matter, Appellant's counsel requested to withdraw from the case.  The court sustained the request and appointed new counsel.  During the suppression hearing, the testimony from Det. Barone and Sgt. Smith caused the state to shift from the plain view doctrine towards the exigent circumstances exception to the warrant requirement for the seizure of the phones.  On August 22, 2024, the trial court denied the motion to suppress, finding

Case No. 25 MA 0039

that the exigent circumstances exception applied allowing officers to seize the phones, and the search warrant authorized the search of those devices.

{¶10} Appellant waived a jury trial and the matter proceeded to a bench trial. Prior to M.P.'s testimony, the prosecutor informed the court that after M.P. had been in contact with defense counsel, the state learned that she intended to recant her allegations. Specifically, the state informed the court that M.P. had "disclosed back in September of 2022 that the defendant sexually assaulted her over time. She was in communication with defendant's prior counsel . . . and she indicated to him that that did not occur. I have had conversations with her since that time and she has indicated the same to me." (Trial Tr., p. 16.)

{¶11} While testifying at trial, M.P. did recant her earlier allegations. She now claimed that while Appellant had pressed his body against her while in bed, she rebuffed his advances and nothing of a sexual nature occurred between them. The illicit photographs and messages between Appellant and M.P. recovered from the Samsung phone were admitted into evidence and were used along with other evidence to discredit her recant.

{¶12} The judge convicted Appellant on all charged offenses and sentenced him to an aggregate total period of incarceration of twenty years to life, with credit for 340 days served. The court also imposed a mandatory five-year postrelease control term. Although it is not referenced within the court's sentencing entry, separately filed sex offender registration documents indicate that he has been classified as a tier three sex offender. However, Appellant refused to sign the documents.

{¶13} It appears that trial counsel failed to file a notice of appeal as promised in this matter. For that reason, Appellant sought and was granted a delayed appeal. This Court appointed Appellant appellate counsel.

{¶14} For ease of understanding, Appellant's arguments are partially addressed jointly, and out of order.

<u>ASSIGNMENT OF ERROR NO. 4</u>

The rape and gross sexual imposition convictions were against the manifest weight of the evidence. (T.d. 62).

{¶15} Appellant claims that because M.P. recanted her allegations pertaining to rape and gross sexual imposition at trial, his convictions are against the manifest weight of the evidence. Appellant emphasizes that she recanted while under oath and that her earlier statements to police were not sworn, raising the implication that her recantation at trial should be afforded greater weight. Appellant urges that M.P.'s failure to recant the allegations which resulted in the other charges give her decision to recant her story as to rape and gross sexual imposition more credibility.

{¶16} The state responds that not only did M.P. describe acts of sexual abuse to multiple police officers and a social worker, she also described these acts to a children's nurse. All of these recorded statements were very detailed. The state also highlights testimony from M.P. where she conceded that she felt pressured to recant her allegations to spare Appellant from prison. The state urges that the judge was in the best position to assess M.P.'s credibility at trial and weigh that against the other evidence introduced by the state.

<u>Case No. 25 MA 0039</u>

**{¶17}** While Appellant does not raise sufficiency of the evidence in his stated assignment of error, he does raise a sufficiency claim within the body of his argument. In fact, his argument relies more on a sufficiency standard than a manifest weight analysis.

**{¶18}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). A trier of fact is free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

**{¶19}** "A reviewing court should not reverse a judgment as against the manifest weight of the evidence in a bench trial where the trial court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt." *State v. Howell*, 2017-Ohio-728, ¶ 16 (7th Dist.), citing *State v. Andric*, 2007-Ohio-6701 (7th Dist.); *State v. Eskridge*, 38 Ohio St.3d 56 (1988).

**{¶20}** Appellant bases a large part of his argument on the fact that M.P. did not recant her allegations supporting the charges of importuning and disseminating matter harmful to a juvenile. He concludes that because she did not fully recant, her partial

recant carries significant weight. This argument is somewhat disingenuous, as M.P. would have lost all credibility had she attempted to recant these allegations and may have been subject to legal ramifications, herself. Police had possession of the text messages giving rise to these charges and the state had already admitted them into evidence prior to her testimony. The state would have easily been able to discredit an attempt to recant those specific charges. Thus, the fact that M.P. did not attempt to recant these allegations is not surprising, as she could not have done so without losing all credibility and putting herself at risk for perjury.

{¶21} While this issue did involve a somewhat delicate situation at trial, as the state had to attack the credibility of a young victim in a sexual assault case, the state offered testimony from other witnesses and evidence, including text messages, that appears to contradict aspects of her recanted story and elicit testimony from her that others had pressured her into recanting.

{¶22} As to the text messages, we note that they contain sensitive material involving a young victim, who was twelve years old at the time. These messages were graphic and highly sexual in nature. They were relevant to the question of whether, after engaging in these graphic and sexually charged communications with M.P., Appellant would have accepted a mere platonic relationship with her while they were essentially living together.

{¶23} M.P. testified that someone she called "Uncle Vince" introduced her to Appellant. It is unclear whether this man is an actual uncle or is a person who is very close to the victim and her family. Vince may also be Appellant's brother, although it is again possible the term "uncle" merely represented a close friendship between Vince and

Case No. 25 MA 0039

Appellant. Regardless, Appellant sent a Facebook message from his account, which is under the name "Eugene Hill" to M.P.'s account, which is in a fictitious name. Appellant's photograph is associated with the Eugene Hill account and it is uncontroverted that this is his account.

{¶24} Appellant initiated contact with M.P. by insinuating that he was Vince. However, it became apparent soon after to M.P. that it was Appellant who had contacted her. Almost immediately the conversation between the two became sexual. On several different dates both Appellant and M.P. initiated these conversations and the illicit photographs and videos are of both Appellant and M.P. It is unclear exactly how many photographs and videos were sent. Apparently, there were at least twenty over approximately a one-month period.

{¶25} The texts are fairly graphic, and describe in detail sexual activities that both Appellant and M.P. wished to engage in, and their desire to engage in a sexual relationship. It is apparent Appellant knew that any sexual relationship was improper due to M.P.'s young age, and admitted "I always want something that im [sic] not supposed to have." (State's Exh. 6.) M.P. acknowledged that the relationship could cause legal problems for Appellant, conceding that she is young and explaining that she was not interested in having "nobody locked up under [her] name." (State's Exh. A.) After M.P. expressed some hesitancy regarding their ages, Appellant responded:

> [Appellant]: You ain't never want to have someone you can just have whenever you want and nobody else knows but ya'll? I just keeps everything fun and exciting. We can be like that ok. They'll never know. N I feel you too.

Case No. 25 MA 0039

[M.P.]:  Right that's exactly what I be sayin.

(State's Exh. 6.)

**{¶26}** The conversation then became highly sexual in nature, revealing Appellant's clear intent that the relationship become sexual.  The texts include nude photographs and videos, along with graphic descriptions of sexual acts that both indicated a desire to engage in with one another.  These texts support the state's position that the two intended to, and did engage, in a sexual relationship, and that it was unlikely Appellant would have accepted a simple "roommate" situation while she was living with him.

**{¶27}** Importantly, in addition to the digital evidence, several witnesses offered evidence to corroborate the existence of sexual abuse in this case.  M.P. first disclosed the sexual abuse to Det. Barone, beginning with describing the electronic communications and then the actual sexual abuse, itself.  She informed him that Appellant knew how old she was, but did not care.  Det. Barone apparently stopped her disclosure at some point and informed Sgt. Smith of her allegations.  Sgt. Smith, who believed he had a good rapport with M.P. from their prior acquaintance, joined the conversation.  M.P. explained that she and Appellant had been corresponding with one another through electronic communications for some time before she began living in the apartment.  (Trial Tr., p. 191.)

**{¶28}** Sgt. Smith testified that M.P. described the sexual conduct between she and Appellant, and pointed to a phone, informing him that evidence could be found on that phone.  He testified that her descriptions of the abuse were detailed, and included reciprocal oral sex and vaginal intercourse.  M.P. stated that Appellant ejaculated on and inside her vagina.  She informed Sgt. Smith that the last time she and Appellant had

sexual intercourse was four days prior, and she had showered at least four times since that time. Sgt. Smith testified that as a rape kit must be completed within three days and can be affected by showering, ordering a rape kit in this case was not an option.

**{¶29}** Sgt. Smith also found it noteworthy that Appellant's mother was confused by the relationship between her son and M.P. Mother explained that she was not permitted to have anyone live with her in the apartment, but Appellant had moved in after her husband's death earlier that year in order to help her around the house. She found it odd that Appellant and M.P. appeared to be in a relationship while inside of the apartment, but not in public, as they would never go outside together. (Trial Tr., p. 189.) Mother informed Sgt. Smith that M.P. did not communicate much with her. This testimony directly contradicted Appellant's initial rambling statements made to police at the apartment, where he claimed he did not know M.P., and said she was a friend of his mother's.

**{¶30}** Social worker Courtney Wilson of the Akron Children's Hospital Child Advocacy Center interviewed M.P. after officers removed her from the apartment. M.P. began the interview by telling Wilson that she and Appellant met through her cousin. The relationship progressed, and the two of them exchanged illicit messages, photographs, and video through Facebook messenger. She explained that Appellant offered to let her stay with him at his mother's apartment. She said that she initially slept on the couch, but on the third night she began sleeping in Appellant's bed with him. (Trial Tr., p. 112.) She explained that the sexual conduct, including oral and vaginal sex, began on that third night. M.P. told Ms. Wilson that such conduct occurred multiple times and that Appellant ejaculated on, and inside of, her vagina.

Case No. 25 MA 0039

{¶31} The trial court relied heavily on the testimony of Monique Malmer from the Child Advocacy Center at Akron Children's Hospital when reaching its verdict. Ms. Malmer is a certified nurse practitioner who evaluated M.P. after she raised allegations against Appellant. Ms. Malmer noted that during the interview portion of the exam:

> [I]t appeared that [M.P.] presented as that was just something that occurs, that that seemed normal, that that was more common than not common for those things to happen, to exchange photos, to be engaging in sexual activities with people older than you. She presented as not recognizing that there was anything wrong with that.

(Trial Tr., p. 217.)

{¶32} Ms. Malmer explained that M.P. provided a detailed statement to her that matches the story M.P. told the officers, not just about the sexual relationship but also as to the entirety of the events that occurred while she lived in the apartment. During these interviews, Ms. Malmer noticed M.P. picking at her skin, showing signs of mental and emotional distress, and she expressed suicidal thoughts, all which raised concerns and tended to corroborate M.P.'s allegations. Ms. Malmer also testified that M.P. confided that she feared Appellant. The trial court emphasized that Ms. Malmer spent between two and three hours with M.P., as opposed to the one-hour block of time which normally was set aside for these types of interviews.

{¶33} Ms. Malmer completed a physical examination on M.P. which revealed injuries consistent with the sexual activities M.P. had described. These injuries were described as quick to heal, thus it was difficult to state their cause with certainty. They

included, however, signs of injury to the genital area. (Trial. Tr., p. 221.) Among these injuries was a "nonacute hymenal tear" which was "likely related to penetration trauma of sexual abuse." (Trial Tr., p. 228.) Ms. Malmer did state that this injury could not necessarily be attributed to any act of Appellant and may have been caused from some earlier encounter.

{¶34} Ms. Malmer explained that her final conclusions regarding her examination of sexual abuse typically fall within one of the following groupings: no concern for sexual abuse, low concern, highly concerning, or confirmatory. Based on the interview and examination of M.P., Ms. Malmer concluded M.P. revealed results "highly concerning for sexual abuse." (Trial Tr., p. 226.)

{¶35} Despite providing both police officers, Ms. Wilson, and Ms. Malmer the same detailed descriptions of her involvement with Appellant, M.P. testified at the bench trial that she had no attraction to Appellant and lacked a desire to engage in a sexual relationship with him. While she conceded that she engaged in sexually driven communications with him, showing her naked body and expressing a desire to perform certain sexual activities, she explained that she only sent these messages because she desperately sought to move out of her father's house. She claimed that she temporarily stopped messaging Appellant when she moved to her "Uncle Vince's" house, however, the record does not contain any evidence about her assertions to support this claim. Regardless, she testified that sometime later she renewed her communication with Appellant because Vince had a bed bug infestation and she wanted out of his house, as well. She testified that someone she refused to identify by name picked her up in the middle of the night and drove her to the apartment where Appellant and his mother lived.

{¶36} M.P. testified that she spent the first few nights on the couch, which was later described by officers as a love seat with no pillows or blankets located anywhere near. She admitted that she began sleeping in bed with Appellant for a few nights, but claimed she stopped once he pressed his body against hers in a sexual manner, causing her to retreat to the couch. She said that she kept her clothes in his room, but changed in the bathroom because the bedroom window had no curtains to provide privacy. There was no evidence that anyone had slept on the loveseat recently, according to officers who observed the area.

{¶37} The state questioned M.P. regarding her recanted allegations, which led to a lengthy discussion of her fear of Appellant and the pressure placed on her by others regarding her allegations.

Q  Okay. And then you also told [Sgt. Smith] that you were engaging in sex acts with [Appellant]?

A  Yes, but the only reason I would say that is because how would you feel if -- you put yourself in my shoes. You have nowhere to go, this, this and that, and you basically just set a man up for failure and then now you have to worry about what he would do to you.

Q  Well --

A  And in the sense, in a sense it would be like you're not really scared cause the man would never hurt you. It was -- it was -- it was a fear response, and I regret lying because why would somebody lie on

somebody. It just doesn't happen. So the fact that I lie, I'm not saying -- and I hate to say this shit, he's not a hundred percent innocent, but he's not a hundred percent guilty in a sense. It -- there was no sexual intercourse, it never happened. I said that cause I was scared. I obviously still got detained for that. So it still served my purpose. And yeah, I just -- I should have never lied about that; should have never happened.

Q So you said you had a fear of what this man could do to you?

A Yeah.

Q So you were scared of him?

A Yeah. He's a big guy.

Q Yeah. So you were scared of him --

A Yeah.

Q -- and what could potentially happen if he --

A Yes.

Q -- were to get out of jail and do something to you?

A Yes.

Q That's --

A  And I have no fear of him any more, what can he do to me.

Q  Okay.  But that's what your fear was, you thought he was capable of hurting you --

A  Yes.

Q  -- if he got out of jail?

A  Yes.

(Trial Tr., pp. 156-157.)

{¶38}  M.P.'s testimony was at times inconsistent and she later changed her testimony regarding her fear of Appellant.  In her earlier testimony, she claimed she was afraid of what might happen to her if he was released from jail.  She later stated:

For the record, it wasn't that I was scared of him because he said anything to me.  He never spoke to me.  It was just like people around, they're like -- like Vince, he was like, don't let him go to jail.  I'm not -- I'm not -- like I said, I'm not going to send an innocent man to jail.  If you're innocent, you're innocent.  If you're guilty, you're guilty.  It is what it is. There's nothing I can do it.  But I'm going to make sure that if it didn't happen, I'm gonna say it didn't happen because I'm not gonna let you have a case of BS for no reason.

(Trial Tr., pp. 166-167.)

Case No. 25 MA 0039

{¶39} The state then focused on a line of questioning regarding comments that "Uncle Vince" made to M.P. about keeping Appellant out of jail:

Q  Okay. So you said that Vince previously made statements to you about not --

A  Like, don't let him go down without a battle.

Q  Okay.  So don't let him go to jail essentially?

A  Yeah.

Q  And you were scared --

A  Yeah.

Q  -- because people said to you, don't let him go to jail?

A  Yeah. Like what would happen if he does go to jail. I can't control that. I -- I'm not the judge. I can't do anything about that.

Q  Right, and that's not on you. I mean, this is -- you were a 12-year-old at the time, that's not on you to keep someone else responsible for not going to jail. But you felt the pressure at that point from other people saying things?

A  Yes.

Q And you don't want him -- you didn't want him to go to jail, you were scared of that?

A Yes.

Q Okay.

(Trial Tr., pp. 167-168.)

{¶40} From the text messages, it is clear that the relationship between M.P. and Appellant began as sexual in nature. While M.P. attempted to downplay what actually occurred once they were living under the same roof, the highly graphic nature of those texts undercut M.P.'s testimony in that regard.

{¶41} At oral argument, Appellant concentrated on the fact that M.P.'s recant of her earlier allegations was made under oath. Counsel contends this fact alone is enough to reverse the verdict, which he described as "fifty-fifty" in Appellant's favor. There is no question from a review of the text messages that both Appellant and M.P understood that a sexual relationship between them was unlawful. In her early Facebook messages, M.P. indicated she had no desire to cause anyone to go to jail. During her testimony, M.P. showed she understood that her allegations would result in legal problems for Appellant and expressed her concern that she would be the reason Appellant may be imprisoned. Her messages to Appellant, combined with her testimony at trial that she did not want to be responsible for anyone being imprisoned, support that the trier of fact could reasonably determine her decision to recant some of her allegations was at least in part due to her realization Appellant would likely be imprisoned due to his sexual relationship with her, which had concerned her from the start of her relationship with Appellant.

Case No. 25 MA 0039

**{¶42}** Based on this record, the judge, as the trier of fact, was well within his discretion to have determined that M.P. recanted her earlier credible allegations due to some combination of fear and outside pressure. Again, there is no question that M.P. was inconsistent in recanting certain of her allegations and conceded that she feared Appellant and had been pressured by third parties into recanting. Where a victim originally makes statements to police indicating sexual abuse took place, but later recants in her testimony, it raises an issue of credibility. Credibility determinations fall within the purview of the trier of fact.

**{¶43}** The First District reviewed a scenario where, in a domestic violence case, the victim recanted her allegations. The state was left with no other evidence to support the charges without the victim's testimony. *State v. Attaway,* 111 Ohio App.3d 488, 491 (1st Dist. 1996). The *Attaway* court explained:

> We note that the record is bereft of any extrinsic corroborating evidence from which to conclude that [the victim's] statement to the arresting officer was more credible than her recantation under oath. * * * [T]he credibility of [the victim's] first statement, which is otherwise uncorroborated and completely contradicted by her sworn testimony at trial, is so inherently suspect that the statement is insufficient as a matter of law to establish [the defendant's] guilt beyond a reasonable doubt.

*Id.* Because the trial court was faced with no evidence other than the single statement the victim gave to police and her sworn total recantation of that single statement, the court

determined it had no credible evidence on which to convict. The matter before us, however, is very different.

**{¶44}** In this case, there is a plethora of evidence confirming M.P.'s original allegations and discrediting her decision to partially recant. We note that investigators entered the apartment with no knowledge that they may encounter any type of abuse investigation, sexual or otherwise. They discovered information of possible sexual abuse after speaking to M.P., who voluntarily disclosed these allegations without any prompting. The investigators, children's services social workers, and the specialized nurse all testified that M.P. consistently described the same acts of abuse in significant detail. The medical evaluation performed on M.P. tended to corroborate M.P.'s allegations. Hence, there is a great deal of evidence in this case on which the trial court could base his determination that M.P.'s allegations were credible and her testimony at trial was not.

**{¶45}** The Fourth District has acknowledged that "it is not unusual in a domestic violence case for a victim to recant or otherwise minimize the behavior of the abuser." *State v. Goss*, 2025-Ohio-3136, ¶ 17 (4th Dist.). The same could be said in regard to sexual abuse, particularly where the victim is a minor and there is evidence that the minor was pressured into recanting. Based on the evidence in this record as a whole, it was reasonable for the trier of fact to find M.P.'s testimony partially recanting her allegations less than credible. As such, Appellant's fourth assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 3

The trial court erred in denying Appellant's motion to suppress as there was no exception to the warrant requirement that allowed police to seize his cellphones on the date of his arrest. (T.d. 40).

**{¶46}** Appellant challenges the trial court's reliance on the exigent circumstances exception to the warrant requirement, as his cellphones were seized at the time he was handcuffed and detained before ultimately being arrested. Hence, he argues that any fear of destruction of potential evidence was unfounded. Appellant also argues that the state is now limited to an argument only as to the exigent circumstances exception and is prohibited from asserting any other warrant exception on appeal, because it raised only exigency below.

**{¶47}** The state responds that the plain view exception to the warrant requirement permitted the officers to seize the phones. The state explains that Appellant's mother allowed the officers into her apartment and understood their purpose for being there. Hence, the officers were unquestionably legally permitted to be inside the apartment. After entering a bedroom to retrieve clothing for M.P. at her direction, an iPhone was in plain view of the officers. It was located next to a scale and bowl containing white powder, and the phone had powder on its screen. Officers then discovered the Samsung phone on a living room table after M.P. disclosed allegations of sexual abuse and pointed to this phone, telling officers it contained evidence of the abuse she described.

**{¶48}** A motion to suppress presents mixed issues of law and fact. *State v. Lake*, 2003-Ohio-332, ¶ 12 (7th Dist.), citing *State v. Jedd*, 146 Ohio App.3d 167, 171 (4th Dist.

2001.). If a trial court's findings of fact are supported by competent credible evidence, an appellate court must accept them. *Id*. The court must then determine whether the trial court's decision met the applicable legal standard. *Id*.

{¶49} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution secure an individual's right to be free from unreasonable searches and seizures and require warrants to be particular and supported by probable cause." *State v. Telshaw*, 2011-Ohio-3373, ¶ 12 (7th Dist.). In order for a search or seizure to be lawful, there must be probable cause to believe evidence of criminal activity will be found and the search or seizure must be executed pursuant to a warrant, unless an exception to the warrant requirement exists. *State v. Ward*, 2011-Ohio-3183, ¶ 33 (7th Dist.).

{¶50} In order to be valid, a search must be supported by a warrant or be based on a recognized exception to the warrant requirement. *State v. Ambrosini*, 2015-Ohio-4150, ¶ 8 (7th Dist.), citing *Katz v. U.S.*, 389 U.S. 347, 357 (1967). In Ohio, there are seven recognized exceptions to the warrant requirement: (1) a search incident to a lawful arrest; (2) consent; (3) the stop-and-frisk doctrine; (4) hot pursuit; (5) probable cause plus the presence of exigent circumstances; (6) the plain view doctrine; and (7) administrative searches. *State v. McGee*, 2013-Ohio-4165, ¶ 17 (7th Dist.), citing *State v. Akron Airport Post No. 8975*, 19 Ohio St.3d 49, 51 (1985).

{¶51} It is important to consider that the analysis pertaining to the warrant exceptions applies only to the seizure of these phones, as they were searched pursuant to a signed warrant. While Appellant also challenges that warrant, the warrant exception analysis in this case is relevant only to seizure of the phones.

Case No. 25 MA 0039

{¶52} Appellant contends that the state is limited to arguing only exigency, because no other warrant exceptions were addressed by the state to the trial court. However, the state's response brief to Appellant's motion to suppress in the trial court exclusively argued application of the plain-view doctrine. At the suppression hearing, the officers' testimony then caused a shift in the state's arguments, from plain view to exigent circumstances. Hence, the state's post-hearing brief focused on the exigent circumstances exception. However, this shift does not change the fact that the state also raised application of the plain error doctrine. Thus, the state is not prohibited from raising either argument on appeal.

{¶53} We note that the court's judgment entry stated that the phones were seized incident to a lawful arrest. While Appellant had been handcuffed and detained, the record reveals that he was not arrested until shortly after seizure of the phones. The state has never claimed the phones were seized incident to a lawful arrest.

{¶54} The trial court denied Appellant's motion to suppress based on the exigent circumstances exception.

> The exigent or emergency circumstances exception to the warrant requirement applies in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when officers are in "hot pursuit" of a fleeing suspect or someone inside poses a danger to the police officer's safety. (Emphasis deleted.)

*State v. Reilly*, 2020-Ohio-850, ¶ 12 (3d Dist.).

**{¶55}** The first phone (iPhone located in the bedroom) was seen to contain suspected drug powder on its screen, and was located next to a scale and a bowl containing the same white powder. Again, no incriminating evidence was found during the later search of this phone, which was found in plain view. The second (Samsung) phone was seized from the living room, where it had been lying in plain sight. Officers were directed to it and were told it contained evidence of crimes involving sexual abuse. There is no question that at the time of the seizure, officers had evidence giving them probable cause to believe a crime had been committed and evidence of that crime would be found on that phone.

**{¶56}** As to Appellant's contention the evidence was not in imminent danger of being destroyed, the state argued that Appellant's mother was in a position to have erased the incriminating evidence after police left, or that Appellant could have remotely erased the device and could have called someone from the jail to perform this action. At the suppression hearing, Det. Barone addressed his concerns with the second phone:

Q  Did you find out if the Defendant -- well, while you were at the apartment, did you find out if there was a passcode on the phone?

A  Yes. There was not.

Q  Okay. Did that concern you at all when it came to the preservation of the evidence on that phone?

Case No. 25 MA 0039

A I'm always concerned with phones. You know, the first thing we'll do is put it in airplane mode, but we are concerned with people accessing the phone and/or being able to wipe it out by not even possessing the phone.

Q Why did you feel like it was important for you to seize that cell phone at that time?

A That was their communication originally. It also -- she said there was many, many naked pictures of her, and also they corresponded sexually all the time on the phone.

Q Were you worried that, if you did not collect the cell phone at that time, that the evidence on that phone could have been destroyed?

A Absolutely.

Q And the defendant was taken into custody at that time, correct?

A Yes.

Q But his mother was not?

A Correct.

(Suppression Hrg., pp. 38-39.)

**{¶57}** The line of questioning with Det. Barone continued on cross examination with defense counsel:

Case No. 25 MA 0039

Q Okay. So he's separated from that cell phone. All right? So he doesn't have access to it. Correct?

A Correct.

Q Okay. How's he going to delete it?

A He's going to go to the jail, call someone and say, hey, you know, delete my phone or whatever. I mean, we're talking hypotheticals.

(Suppression Hrg., p. 50.)

**{¶58}** Resolution of this issue is fact dependent. There is no bright-line rule that applies to every circumstance, and a court must limit its decision in determining whether to apply the exigent circumstances doctrine to the specific facts of a given case. It is commonly known in today's society that cellphones store large volumes of highly personal information and can be erased remotely or in-person by either the cellphone owner or a third party. That said, this record shows there was an actual risk of destruction by a specific person, Appellant's mother. While she initially cooperated with the investigation, there is evidence that once M.P. raised allegations of sexual abuse, Appellant's mother grew impatient and angry with M.P. Mother requested that officers expedite their efforts and get M.P. and her belongings out of her apartment, suggesting she blamed M.P. for her son's obvious legal predicament. There is also evidence that Appellant moved into the apartment following the death of Mother's husband to help out around the house. Thus, Mother held an interest in not only protecting her son from any legal problems, but in maintaining his assistance in the apartment. These facts support the officers'

contention they feared evidence would be destroyed if they left the devices in Mother's apartment with her. The record also shows that even if the trial court had determined exigent circumstances did not exist based on the facts of this case, the state also relied on the plain view doctrine.

**{¶59}** The Ohio Supreme Court has held that:

> In essence, the plain view doctrine allows police officers, under particular circumstances, to seize an "article of incriminating character" which is not described in their search warrant. The doctrine "is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost . . ."

*State v. Halczyszak*, 25 Ohio St.3d 301, 303 (1986), citing *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

**{¶60}** The plain view doctrine contains a three-part test: "First, the initial intrusion that brought the police into a position to view the object must have been legitimate. Second, the police must have inadvertently discovered the object. Third, the incriminating nature of the object must have been immediately apparent." *State v. Vance*, 2018-Ohio-5409, ¶ 26 (7th Dist.), citing *Halczyszak* at 303.

**{¶61}** Again, there is no question that officers were legitimately inside the apartment, as Mother allowed them inside knowing that they were conducting an investigation into the whereabouts of M.P., who Mother knew to be inside her apartment. Mother did not ask officers to present a warrant. There is no evidence that she objected when the officers entered Appellant's bedroom to locate M.P.'s clothing at her direction.

Case No. 25 MA 0039

In fact, it appears Mother encouraged the officers at some point to collect M.P.'s belongings and remove them from the apartment. Similarly, by all accounts the officers were permitted without objection to sit in the living room with M.P. and talk to her. Mother allowed this to occur while she, herself, spoke to officers in the kitchen. The phones at issue were found lying openly in two of these locations, where police were permitted to be.

**{¶62}** Next, a trial court must determine that the objects seized were inadvertently discovered by police. "The requirement that evidence may be seized only if discovered inadvertently was intended to guard against planned, warrantless seizures." *Halczyszak* at 303. "[W]hen police 'know in advance [what] they will find in plain view and intend to seize,' they must either include such objects in the initial warrant or obtain an additional warrant." *Id.,* citing *Coolidge v. New Hampshire*, 403 U.S. 443, 471 (1971).

**{¶63}** The first phone was discovered when police entered the bedroom to collect clothing for M.P., who had instructed the officer where to find her clothes. The officer immediately noticed the bowl, scale, and phone on the nightstand. The white powder in the bowl and on the phone's screen reasonably raised suspicions of drug activity. While Appellant claimed the powder was not a drug and later testing confirmed this, police had a reasonable suspicion otherwise, at the time. Again, no evidence was discovered when this phone was later searched and Appellant's mother described it as an old phone no longer used by Appellant.

**{¶64}** As to the second phone, it became of interest to officers after M.P. disclosed her abuse and informed police that this phone contained illicit messages, photographs, and videos she and Appellant had exchanged that supported her allegations of sexual

abuse. At the time police entered the house, their sole intent was to locate M.P., a runaway twelve-year-old. There is no evidence that police had any idea they would discover evidence of an inappropriate relationship between M.P. and any individual before she disclosed Appellant's abuse. Police were not seeking Appellant and had no knowledge he lived in the apartment, as his name was not on the lease, until they entered and discovered him while retrieving M.P.'s clothes.

**{¶65}** It was not until M.P. began talking with officers that she voluntarily disclosed the sexual relationship with Appellant. This is the first time officers became aware of the changed nature of their investigation. M.P. informed officers that her relationship with Appellant began through electronic messages which she said could be found within Appellant's phone. Sgt. Smith saw the phone openly lying on a living room table and M.P. pointed to it and confirmed it was the phone Appellant used to communicate with her. (Suppression Hrg., pp. 37-38.) Appellant's mother confirmed to officers that Appellant currently used the second (Samsung) phone as his regular phone at that time. It is clear the phone was not previously intended as the subject of any police search.

**{¶66}** The plain view doctrine also requires that the incriminating nature of the object be immediately apparent. Again, M.P. described the nature of the phone's contents, which included nude photographs and videos containing sexual content. She told officers that Appellant knew she was twelve years old and "just didn't care." (Suppression Hrg., p. 15.) Officers knew both M.P.'s age and Appellant's age. They were given a clear understanding of the contents of the phone. It would have been immediately apparent to officers that this phone would likely contain incriminating evidence. The law does not require officers to act only on a certainty. They need only possess probable

cause to associate some evidence with criminal activity. *Halczyszak* at 304. M.P.'s statements are sufficient to link the phone to evidence of criminal activity, and this was immediately apparent to officers once she made those statements.

**{¶67}** As Appellant concedes, no search of either phone was conducted at the time they were seized. The sole focus of Appellant's arguments, here, is directed towards the trial court's decision that seizure was appropriate. As all three prongs of the plain view doctrine have also been met, the seizure of the phones was lawful under this exception, as well. Accordingly, Appellant's third assignment of error is without merit and is overruled.

<u>ASSIGNMENTS OF ERROR NOS. 1 & 2</u>

The trial court erred in denying Appellant's motion to suppress as the September 13, 2022, warrant did not state with particularity the items to be searched. (T.d. 40).

Trial counsel were ineffective for failing to argue in suppression that the September 13, 2022, warrant did not convey to law enforcement any authority to search any device that was in, or could later come into their possession. (T.d. 18).

**{¶68}** Moving from the decision of police to seize his phones, Appellant attacks the search warrant issued in this case, claiming that it failed to identify the cellphones as the target of the warrant, and challenging whether the warrant appropriately authorized a search. All parties acknowledge the only reference to the cellphones within the warrant itself is limited to a line authorizing officers to seize and examine any cellular devices

<u>Case No. 25 MA 0039</u>

belonging to Appellant. The warrant does not describe any specific phone(s) of interest. Hence, the warrant does present a deficiency. While acknowledging that an affidavit can appropriately be used to bolster a warrant, Appellant contends there is no evidence the affidavit used to secure the warrant was attached to the warrant, and the warrant did not expressly incorporate the affidavit. Appellant also argues that trial counsel was ineffective for failing to argue that the search warrant gave no command to search. Instead, it merely ordered Appellant to provide investigators with all of his cellphones, which officers already possessed at that time.

{¶69} The state argues that the warrant satisfied the particularity requirement, as it authorized seizure and search of "all cellular devices belonging to [Appellant]." (State's Exh. 1.) The state's contention is that no more is required to satisfy the particularity requirement. While conceding the warrant does not specify what portion of the phone's content law enforcement could search, the state urges that the warrant narrowed the scope of potential evidence to the allegations of rape and gross sexual imposition. Thus, the warrant allowed a search only for evidence relating to those crimes, as opposed to a full exploratory search of the cellphones for any evidence of any crime. Further, the affidavit used to obtain the warrant specifically identified the phones and alleged that Appellant's phone was used "to engage in sexually charged communications and exchange sexually explicit photographs" with a specifically described minor child.

{¶70} The state concedes that the warrant, by itself, is deficient in that in order to uphold this warrant, the court must rely on the good faith exception analysis. While the state also appears to state that there is no evidence JoAnn Gibbs, the Bureau of Criminal Investigations ("BCI") officer who undertook the search, had possession of both the

Case No. 25 MA 0039

warrant and affidavit, it notes that Gibbs specifically analyzed only areas of the phone (message and Facebook apps) that corresponded with M.P.'s allegations as to how she and Appellant communicated with one another. The search yielded evidence the search warrant was intended to retrieve, which included call logs, Facebook messages, and photographs confirming M.P.'s allegations.

{¶71} As the language of the warrant is critical to the analysis, it is quoted here in its entirety:

> From the affidavit, and any recorded testimony, if any, sworn to before me, as judge of this court of record, find that grounds exist demonstrating probable cause to support the allegations of Rape and Gross Sexual Imposition a Felony under Title 2907 of the ORC therefore ordering [Appellant] to turn over all cellular devices to the Mahoning County Sheriff's Office for examination.

> You are hereby commanded to seize all cellular devices from [Appellant], serving this warrant only in the daytime (between 7:00 AM and 8:00 PM) within three (3) days, excluding the date this warrant is issued and (Saturday, Sunday, and any legal holiday) leaving a copy of this warrant and a receipt for seized property[.] This warrant will be returned to the undersigned judge promptly upon execution in accordance with law.

(Personal Identifiers Omitted.) (State's Exh. 1.)

{¶72} Appellant urges that his counsel was ineffective for failing to include in his suppression motion an attack on the warrant. Beginning with Appellant's ineffective

assistance of counsel argument, "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *State v. Schwartz*, 2014-Ohio-4418, ¶ 12 (7th Dist.), citing *State v. Madrigal*, 2000-Ohio-448, *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). An appellant must show that this motion "would have had a reasonable probability of success." *Schwartz* at ¶ 12, citing *State v. Nields*, 2001-Ohio-1291. Review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. While Appellant's counsel did file a motion to suppress in this matter. Appellant contends an additional ground for that motion should have been raised.

**{¶73}** As seen in the language quoted above, the warrant required all cellphones belonging to Appellant be turned into the Sheriff's Office "for examination." As addressed by the state, Black's Law Dictionary defines examination as "[a]n Investigation; search; interrogating." (*Black's Law Dictionary*, 2d Ed. 2025.) Thus, the terms "search" and "examination" are synonymous; they have the same meaning. Whether the term "search" or "examination" was used, it is clear from the relevant definitions that a search of the phones was authorized by the warrant. Consequently, any motion to suppress based on an alleged failure of the warrant to authorize a search would have been fruitless. Pursuant to Ohio law, trial counsel is not ineffective for failing to file a motion to suppress where it would have been unsuccessful.

**{¶74}** Appellant also claims that the search warrant lacked particularity as to what evidence officers were entitled to search for and where in the phone they were permitted to search. The warrant itself refers only to "all cellular devices." There is no further specificity contained in its language.

Case No. 25 MA 0039

In determining whether a search warrant satisfies the Fourth Amendment's particularity requirement, reviewing courts employ a standard of practical accuracy rather than technical precision. *United States v. Otero* (C.A. 10, 2009), 563 F.3d 1127, 1132. "(A) search warrant is not to be assessed in a hypertechnical manner (and need not satisfy the) '(t)echnical requirements of elaborate specificity once exacted under common law pleadings.' " *United States v. Srivastava* (C.A. 4, 2008), 540 F.3d 277, 289, quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965). A search warrant will be held sufficiently particular when it enables a searcher to reasonably ascertain and identify the things authorized to be seized. *United States v. Riccardi* (C.A. 10, 2005), 405 F.3d 852, 862. "The common theme of all descriptions of the particularity standard is that the warrant must allow the executing officer to distinguish between items that may and may not be seized." *United States v. Leary* (C.A. 10, 1988), 846 F.2d 592, 600, fn. 12.

*State v. Bugno*, 2022-Ohio-2008, ¶ 32 (7th Dist.), citing State v. Gonzales, 2014-Ohio-557 (3d Dist.).

{¶75} "Courts have held that the Fourth Amendment does not require heightened protections for computers, nor does it diminish its protections because of the challenges of searching them. "The 'bedrock principle' is 'reasonableness on a case-by-case basis'." (Internal citations omitted.) *State v. Castagnola*, 2015-Ohio-1565, ¶ 74.

{¶76} The test engaged in cases of alleged lack of particularity is found in *Castagnola*:

Case No. 25 MA 0039

[T]he particularity requirement of the Fourth Amendment applies to the search of a computer and requires a search warrant to particularly describe the items believed to be contained on the computer with as much specificity as the affiant's knowledge and the circumstances of the case allow and that the search be conducted in a manner that restricts the search for the items identified.

*Castagnola* at ¶ 98.

**{¶77}** State's exhibit 1 is the search warrant. Stapled to the warrant is Det. Barone's affidavit supporting his request for, and issuance of, the warrant. However, it is unclear whether these documents were stapled together before or after the warrant was offered as an exhibit. The affidavit contains a section titled "Item to be seized by Law Enforcement." This section describes "1) (1) Black/Red Iphone with unknown white substance on the screen collected and placed in Bio-hazard bag. 2) Black Samsung smart phone Type: Galaxy A11 Model: SM-A115U Serial #: R95N90MN05B IMEI: 356211710280887." (State's Exh. 1, p. 2.) The phones were also described in terms of their location at the time the affidavit was prepared: "the Affiant has probable cause to believe that there [sic] will be found in the **BCI Evidence Room, 20 W. Federal St., 3rd Floor, Youngstown, Mahoning County, Ohio 44503**[.]" (State's Exh. 1, p. 2.)

**{¶78}** The state concedes the warrant did not incorporate the affidavit by reference. Absent this specific incorporation, the record must contain some evidence that JoAnn Gibbs from BCI had possession of both the affidavit and the warrant contemporaneously. The state points out that the warrant specifies the trial court found "grounds exist demonstrating probable cause to support the allegations of Rape and

Case No. 25 MA 0039

Gross Sexual Imposition . . . therefore ordering [Appellant] to turn over all cellular devices to the Mahoning County Sheriff's Office for examination." (State's Exh. 1.) The state contends we must infer from this language that the scope of the search was limited to evidence relating to those offenses.

**{¶79}** The state also points out that the forensic analysis of the cellphone itself shows that Gibbs had the affidavit in her possession. Gibbs performed a forensic analysis of the digital media on Appellant's two cellphones. During this process, Gibbs extracted call logs, text messages, Facebook messages, and photographs from one of the phones. She discovered through this analysis that Appellant and M.P. were exchanging illicit photographs and messages through Facebook messenger and text messages, as alleged by M.P.

**{¶80}** It is apparent from the record, although not discussed by either party, that Det. Barone testified he gave Gibbs both the search warrant and the affidavit at the time she was tasked with the search. During direct examination, Det. Barone and the state entered into the following discussion:

A This is the search warrant and the affidavit that I applied for in reference to [Appellant's] cellular devices.

Q Okay. So that was -- *you said that includes the affidavit which contains the information that you learned through this investigation, correct?*

A Yes.

*Q And it also includes a search warrant* that was signed by -- it was Judge Krichbaum, correct?

A Judge Krichbaum, yes.

*Q* Okay. And as you said, once that was completed, *you then submit those to BCI, correct?*

*A Yes.*

(Emphasis added.)  (Suppression Hrg. Tr., p. 16.)

**{¶81}** During this testimony, Det. Barone clearly states that he prepared an affidavit and received a search warrant, and responded in the affirmative when asked if he "submit[ed] *those* to BCI."  (Emphasis added.)  (Suppression Hrg., p. 16.)  As Det. Barone testified that he sent both the affidavit and the warrant to BCI, this testimony can only lead to the conclusion that Gibbs possessed both the warrant and affidavit when executing the search.

**{¶82}** Additionally, as raised by the state, Gibbs did perform a search consistent with the affidavit.  The evidence obtained included Facebook messages, text messages, and photographs in support of the allegations listed on the warrant itself, as requested through the affidavit.  While certainly not conclusive, this provides evidence that Gibbs reviewed both the warrant and the affidavit and relied on the affidavit's parameters in doing her search.

**{¶83}** The state relies on *Bugno* to support its contention.  In *Bugno,* this Court reviewed whether a warrant included a command to seize and a description of the

Case No. 25 MA 0039

property to be seized. *Id.* at ¶ 39. In the event that it did not, we also reviewed whether the officers in that case relied on the warrant in good faith. *Id*. at ¶ 42. As to the first issue, this Court held that the following language was sufficient to search and seize the relevant items:

> An HP Pavillion DV9700 Laptop, Model #KR269AV, S/N CNF8241JZK. Authorization is requested by searching officers to seize, search, listen to, read, review, copy, operate, and/or maintain the above-described property and to convert it to human-readable form as necessary. All of which is evidence in the following criminal offenses: O.R.C. 2907.04 Unlawful Sexual Conduct with a Minor; 2907.07 Importuning; 2907.31 Disseminating Matter Harmful to Juveniles; 2907.322 Pandering Sexually Oriented Matter Involving a Minor.

**{¶84}** This Court distinguished its holding from a case the appellant relied on, *Castagnola*. In *Castagnola,* the warrant allowed for a "blanket search 'of records and documents stored on the computer' with no further limiting information or instruction. In *Bugno,* the "warrant only allowed for a search of evidence relating to certain sex offenses involving juveniles." *Id.* at 41.

**{¶85}** The search warrant at issue in this matter provided:

> From the affidavit, and any recorded testimony, if any, sworn to before me, as judge of this court of record, find that grounds exist demonstrating probable cause to support the allegations of Rape and Gross Sexual Imposition a Felony under Title 2907 of the ORC therefore ordering

[Appellant] to turn over all cellular devices to the Mahoning County Sheriff's Office for examination.

(State's Exh. 1.)

**{¶86}** While not couched in the identical language, the instant warrant is consistent with *Bugno*. The warrant specified the charges before ordering Appellant's phones be turned over to investigators for a search of those phones. In *Castagnola* the warrant broadly provided for a search of "[r]ecords and documents stored on computers." *Id.* at ¶ 76. Here, the search is sufficiently limited to evidence of the allegations of rape and gross sexual imposition contained in Appellant's cellphone.

**{¶87}** Appellant also relies on *Bugno* in this matter. We note that Appellant is correct that this case involves facts a step removed from the facts in *Bugno*. The warrant here did not incorporate the affidavit by reference. Appellant takes the position that the warrant must incorporate the affidavit by reference in order to take into account the limitations of the search contained in the affidavit and thus support an arguably otherwise deficient warrant. We have already determined that the search was appropriate, here, as the warrant and supporting affidavit together supported the search, even though words of incorporation were absent from the warrant. However, even if we were to agree with Appellant on this point, it would not end our review, as a search based on a defective warrant may not be suppressed where officers relied on the warrant in good faith.

**{¶88}** "The exclusionary rule should not be applied to suppress evidence obtained by police officers acting in objectively reasonable, good faith reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid." *State v. Wilmoth,* 22 Ohio St.3d 251, paragraph one of the syllabus (1986).

**{¶89}** "Under the good-faith exception, evidence obtained during a search conducted pursuant to a warrant that is unsupported by probable cause will not be excluded if the officers who obtained the evidence acted reasonably in relying on the warrant." *State v. Dibble*, 2020-Ohio-546, ¶ 9, citing *United States v. Leon*, 468 U.S. 897, 924-925 (1984).

> [S]uppression would still be appropriate in circumstances when (1) the supporting affidavit contained information the affiant knew to be false or would have known to be false but for reckless disregard of the truth, (2) the issuing magistrate wholly abandoned his judicial role, (3) the warrant was based on an affidavit " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' " or (4) the warrant is so facially deficient in terms of particularity that the executing officers could not reasonably presume it to be valid.

*Dibble* at ¶ 9, citing *Leon* at 923; *Brown v. Illinois*, 422 U.S. 590, 610-611 (1975); *State v. George*, 45 Ohio St.3d 325, 331 (1989).

**{¶90}** The state cites to *Massachusetts v. Sheppard*, 468 U.S. 981 (1984). In *Sheppard*, an officer filled out a search warrant application but used an incorrect form. *Id*. at 985. The officer crossed out certain nonconforming aspects in an attempt to modify the form. On review, the judge stated that he would grant the warrant but would need to make some changes to comport with legal requirements. *Id*. at 986. The officer watched as the judge made changes, but apparently could not see if all changes were made, and was unaware that the judge failed to make all necessary changes. *Id*. at 989. While the

*Sheppard* Court acknowledged the warrant was deficient, it found that the good faith requirement applied and the officers could not be faulted for believing that a judge would correct changes he specifically stated he would correct, especially after observing the judge make some changes. *Id*. at 990.

**{¶91}** None of the four factors set forth above prevent the good faith exception from applying, here. There is no allegation that any of the information contained within the affidavit is false, and the first factor does not apply. There is likewise no evidence that the judge abandoned his judicial role in signing the warrant. As to the third and fourth factors, the affidavit in this case is not lacking in probable cause nor is the warrant so facially deficient that it could not be presumed valid.

**{¶92}** Again, as in *Bugno,* this warrant made clear that a search was authorized and the search was limited to only evidence of the listed offenses. The affidavit clearly guides the searcher to areas of the phones where evidence relating to those specific offenses would be found. While the affidavit is not specifically incorporated into the warrant, according to the unrebutted testimony of Det. Barone, whether or not they were physically attached, he gave Gibbs the search warrant and the affidavit at the same time. Gibbs then searched the phones and exclusively found the evidence delineated by investigators. She discovered no evidence that appears to fall outside the bounds of the warrant. Hence, the good faith exception does not bar the digital evidence. While the warrant in this case falls short of setting the gold standard for draftsmanship, based on this record and the evidence before us it is not fatally defective, counsel was not ineffective in failing to add allegations into the motion to suppress, and the trial court did not err in failing to suppress the evidence discovered in the search.

**{¶93}** We must note that even assuming the digital evidence could have been suppressed, as previously discussed this record contains a plethora of evidence supporting the verdict. While the digital evidence is certainly relevant as additional evidence supporting the rape convictions, there was an abundance of unrebutted testimony supporting Appellant's charges from police officers, social workers, and a children's nurse. While the digital evidence is more relevant to the importuning and disseminating harmful material to a juvenile convictions, those offenses are also supported not only by the above referenced witnesses, but by M.P. herself, who testified about the messages and their content. Thus, Appellant's convictions would be affirmed even if Appellant was correct that the digital evidence could have been suppressed.

**{¶94}** Accordingly, Appellant's first and second assignments of error are without merit and are overruled.

## Conclusion

**{¶95}** Appellant's arguments focus on the seizure and search of his two cellphones that police located at his mother's apartment where he was living. Appellant also argues that his convictions are against the manifest weight of the evidence because the victim recanted her allegations at trial. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Robb, P.J. concurs.

Dickey, J. concurs.

Case No. 25 MA 0039

———————————————

For the reasons stated in the Opinion rendered herein, Appellant's assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**